IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM HARDEN                    *
                                  *
          v.                      *        Civil Action WMN-09-CV-1123
                                  *
WICOMICO COUNTY, MD et al.         *

     *     *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM**

Before the Court is Defendants Wicomico County, MD and Douglas Devenyns' Motion for Summary Judgment. Paper No. 35. The motion is fully briefed. Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and the motion will be granted as set forth below.

**I.    BACKGROUND**

Because Plaintiff is the non-moving party, the facts are stated, with reasonable inferences drawn, in the light most favorable to Plaintiff. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). On March 13, 2006, Plaintiff began working for the Wicomico County Detention Center (WCDC) as the internal affairs investigator. The position initially entailed performing background investigations of potential new employees, but his responsibilities grew to include drug and gang investigations, screening inmate grievances, and investigating security threats at the jail. During the first

1

year, Plaintiff performed well, received two raises and was given supervisory powers.  On his one year anniversary date, he received information from Pastor Richard Parrott that Defendant Douglas Devenyns, the Director of the WCDC,[1] was "sleeping with his staff."  Pastor Parrott told Plaintiff that he had learned of the allegations from members of his congregation.  Pastor Parrott's son had just been arrested and allegedly assaulted by other inmates while in custody at WCDC.

Plaintiff believed that the allegation merited further inquiry.  He immediately began questioning veteran employees of WCDC regarding the allegation.  He spoke with Captain Preston Foreman, Lieutenant Adam Bynum, and the Chief of Administration, Benita Shockley.  According to Plaintiff, each informed Plaintiff that they had heard that Mr. Devenyns and Jean Murray, a medical staff employee, had engaged in a sexual relationship.

According to Plaintiff and Ms. Shockley's deposition, Ms. Shockley told him that Deputy Director Rosalind Roberts had told her that she had walked in on Ms. Murray and Mr. Devenyns on the couch.  Shockley Dep. 23-24.  Ms. Shockley determined from Ms. Roberts' demeanor that they were involved in a sexual relationship.  Id.  Ms. Shockley also observed Ms. Murray

---

[1] Mr. Devenyns resigned from his position as Director effective November 6, 2009 and no longer works at WCDC.

exiting Mr. Devenyns' office on a Saturday, in a disheveled

state, fixing her wig and clothing.  Id. 18-21.

After speaking to Ms. Shockley, Mr. Foreman, and Mr. Bynum,

Plaintiff alleges that he spoke to Ms. Roberts.  According to

Plaintiff, Ms. Roberts told Plaintiff that

> she walked in on Mr. Devenyns in his office with Jean
> Murray bent over the desk . . . [Mr. Devenyns] was
> seated behind Ms. Murray and . . . the upper portion
> of her two piece nurse's outfit was in disarray and
> her hair was in disarray, [and] her buttocks was [sic]
> facing Mr. Devenyns.

Pl. Dep. 74.  Plaintiff claims that Ms. Roberts did not

initially concede that she had witnessed a sexual encounter

between Ms. Murray and Mr. Devenyns.  He states, however, that

when he asked Ms. Roberts about how she felt about walking in on

Mr. Devenyns having sex with Jean Murray, that she replied

"embarrassed and ashamed" and then said, "Shit."  Id. at 76.

Based on this information, Plaintiff brought the

allegations of sexual impropriety to County Executive Richard

Pollitt.  By that time, Plaintiff had learned that Ms. Murray

was no longer an employee of WCDC but knew that, at one point,

"she was an employee and th[en] she wasn't and then she was

again."  Id. at 68-69.  After learning of the allegations, Mr.

Pollitt granted Plaintiff permission to conduct an investigation

of Mr. Devenyns.

On March 15, 2007, Plaintiff met with Mr. Pollitt, Director
of Administration Theodore Shea (Mr. Devenyns' supervisor), and
County Attorney Edgar Baker to discuss his initial findings.
They decided to speak to Ms. Roberts regarding her observation
of walking in on Mr. Devenyns and Ms. Murray.  Ms. Roberts gave
her statement to the group the next day.  Mr. Pollitt testified
in his deposition that Ms. Roberts was very hesitant to talk,
but that they finally convinced her to articulate what she had
seen.  Pollitt Dep. 19-20.  Ultimately, according to Mr. Pollitt
she told the group that she saw Mr. Devenyns sitting in his
chair behind his desk and Ms. Murray leaning over Mr. Devenyns
desk and indicating some papers, with her outer coat bunched up
on her back.  Id. at 20.    Ms. Roberts provided a similar
narrative during her deposition.  Roberts Dep. 56-57.  Mr.
Pollitt recalled thinking "all of that for this."  (Pollitt Dep.
21.)  He also testified that he came to the conclusion that Ms.
Roberts had not given them anything if they were expecting the
group to take any actions.  Id. at 25-26.

Ms. Roberts in her deposition denied that when she walked
into Mr. Devenyn's office that he was having sex with Ms.
Murray.  Roberts Dep. 18.  She also claims that Plaintiff never
asked her about what she witnessed, but simply told her to go to
Mr. Pollitt's office and Mr. Pollitt asked her about it.  Id. at
55.  Finally, when asked what she saw that was so shocking, she

testified that something must have happened overnight with an inmate that she did not know about. Id. at 18-22.

Nonetheless, Mr. Pollitt wrote a letter to Colonel Thomas E. Hutchins of the Maryland State Police on March 23, 2007, requesting assistance conducting an investigation into allegations of administrative impropriety within WCDC. Ultimately, the police declined to intervene and recommended the County seek the assistance of the Attorney General's Office.

Plaintiff continued his investigation by questioning WCDC employees Alicia Crayton, Phillis Murray, and Brenda Holden. Plaintiff had heard that Ms. Crayton and Phillis Murray had slept with Mr. Devenyns, but in their interviews, they denied the allegations. Plaintiff claims, however, that Phyllis Murray informed him that "a lot of women at WCDC would come forward, but that they were afraid." Pl. Dep. 253.

Plaintiff also spoke to WCDC Medical Contractor Dr. Mahabir Sharma. According to Plaintiff, Dr. Sharma told him that, while responding to a medical issue at WCDC, he observed Ms. Murray and Mr. Devenyns together in Mr. Devenyns' office in disarray. Id. at 90-92. Plaintiff also alleges that Dr. Sharma told him that Mr. Devenyns told him that he (Mr. Devenyns) had had sex with Ms. Murray, and that for forty-five dollars he (Dr. Sharma) could have sex with her too. Id. at 90. In his deposition, Dr. Sharma denies making such a statement and says that he had no

knowledge regarding any alleged sexual relationship between Mr. Devenyns and Ms. Murray and never saw anything inappropriate between them.  Sharma Dep. 23, 29-30, 32-33.  He also testified that Ms. Murray was the head nurse and her duties involved working with Mr. Devenyns on a daily basis as part of her job. Id. at 19.

Plaintiff detailed his findings in two investigative reports dated April 4, 2007 and April 5, 2007.  The reports were sent to Mr. Pollitt, Mr. Shea, and Mr. Baker.  The April 4, 2007, report described his conversation with Ms. Roberts and Dr. Sharma.  The April 5, 2007, report listed several unconfirmed allegations of financial improprieties by Mr. Devenyns.

Plaintiff claims that in May 2007, Mr. Devenyns told him that he slept with maybe five women at WCDC, including Ms. Murray.  Pl. Dep. 130.  After this confession, Plaintiff wrote a third, undated investigative report containing this allegation, and the complaint that his previous reports had not been passed on to entities capable of conducting an independent investigation.  Plaintiff delivered this third report to Mr. Pollitt.

Mr. Devenyns, in his deposition, denied making any such statement.  Devenyns Dep. 130-31.  Mr. Devenyns also denied having a social or sexual relationship with Ms. Murray.  Id. at 119-20.  Ms. Murray, in her deposition, also denied having a

social or sexual relationship with Mr. Devenyns or that he ever sexually harassed her in any way.  J. Murray Dep. 6, 44-49.

Plaintiff claims that as a result of the investigation he began to be treated differently by Mr. Devenyns and Ms. Roberts. He alleges that Mr. Devenyns no longer allowed him to enter his office and took away special duties promised to Plaintiff.  He also alleges that Ms. Roberts taunted Plaintiff in a December 2007 command staff meeting by stating that Plaintiff acted like he was the new Security Chief.  Later the same day, Plaintiff alleges that Ms. Roberts called him a "motherf****r."  Plaintiff filed an official employee grievance against Ms. Roberts as a result and received a very patronizing apology.

Defendants contend that starting in spring 2008 that Plaintiff's behavior began to be a problem.  In May 2008, Plaintiff was directed to attend a training workshop, but Plaintiff did not attend or contact his supervisor to explain his absence.  Plaintiff claims, however, that he had been told by Mr. Devenyns that he did not need to attend any training that would be duplicative.  Also in May 2008, Plaintiff posted his April 4 and 5, 2007, reports on a local blog.  On May 22, 2008, in response to an e-mail from Captain Mike Elliott of the Sheriff's Office regarding grant opportunities, Plaintiff replied by writing "MIKE, THANKS FOR THE HEADSUP [sic].  WHEN CAN YOUR SHERIFF TAKE THIS PLACE OVER.  LOT OF WRONG GOING ON."

On June 9, 2008, Thomas Kimball began working at WCDC in the newly created position of Chief of Security.  Mr. Devenyns directed Plaintiff and his two subordinates to begin reporting to Colonel Kimball.  Plaintiff's supervisor, Colonel Kimball kept notes on problems with Plaintiff.  An entry dated June 9, 2008, says that "Harden spoke of filing an EEOC complaint."

On June 24, 2008, the county received a notice of discrimination, but it didn't contain the name of the person who filed the charge.

On July 9, 2008, Mr. Devenyns sent a letter to Mr. Pollitt asking to know the status of the investigation, which he said had been going on for over a year with no evidence of any wrongdoing by him.  Mr. Devenyns said that Plaintiff was still contacting individuals who worked for or used to work for the County to ask if they had any "dirt" on Mr. Devenyns.  Mr. Devenyns stated that he believed Plaintiff's actions amounted to harassment and that, despite the complete lack of evidence, it seemed that Plaintiff was out to get him.

In July 2008, Plaintiff anonymously mailed copies of his three investigative reports to Councilwoman Stevie Prettyman in an unmarked envelope with no return address and no indication as to who sent them.  Plaintiff stated in his deposition that he had a personal obligation to "do what [he] could to bring out improprieties" within WCDC.  Pl. Dep. 145.

In July 2008, Colonel Kimball asked Plaintiff to start
providing him with an itinerary of his and his subordinates
duties and activities during working hours.  Plaintiff's first
response was to state only that they were performing
"administrative duties."  Plaintiff also responded by filing a
grievance against Colonel Kimball with the Assistant Director of
Administration in the County on July 21, 2008.  In his
grievance, Plaintiff stated that he had filed a complaint with
the EEOC against Mr. Devenyns and Ms. Roberts.  It appears that
Colonel Kimball received a copy of the grievance around August
1, 2008.  Personnel Hr'g Tr. 180.

Colonel Kimball responded to Plaintiff's itinerary with a
memorandum on July 22, 2008, asking for more detail.  Plaintiff
responded the same day with a memorandum stating that the
itinerary he provided was the best that he could do because his
work often involved unforeseen projects.  He also stated that he
never had any time management problems in the past and found
Colonel Kimball's itinerary request demeaning, insulting, and
"retaliatory."  He told Kimball that he had filed an official
grievance against him on July 21, 2008, and indicated that the
integrity of his investigations had never been questioned prior
to filing his EEOC complaint.

On July 25, 2008, Plaintiff accidentally locked his keys
inside his office.  Laurie Naugle, Mr. Devenyns' secretary, kept

the spare key in the middle drawer of her office desk.  As Ms.

Naugle had already left for the weekend and her office door was

locked, Plaintiff called Ms. Shockley and she gave him the key

to Ms. Naugle's office.  Once inside, Mr. Harden attempted to

open the middle desk drawer.  Believing it was jammed, he tugged

on the handle and opened it.  Upon closing the drawer, he

realized that he had damaged it.  Plaintiff immediately informed

Ms. Shockley and called Ms. Naugle about the damage.  Plaintiff

claims he offered Mr. Devenyns a report on the incident the

following Monday morning, but that Mr. Devenyns refused to hear

his explanation.

On July 28, 2008, Mr. Devenyns placed Plaintiff on

administrative leave with pay pending the outcome of an

investigation into his violations of the County's policies and

procedures.  As part of the investigation, Plaintiff had to

submit a written report regarding the desk incident.

At some point when Defendant Devenyns was in the process of

terminating Plaintiff, he referred the matter to the County

Attorney, Edgar Baker, who received Kimball's notes.  Next to

the June 9, 2008, entry discussing Plaintiff's filing of an EEOC

complaint, Mr. Baker wrote "Told Doug."[2]  During his deposition,

however, he could only say with certainty that he hadn't told

---

[2] Doug is Defendant Devenyns first name.

Mr. Devenyns about the EEOC complaint, but he could not say what was told to Doug or by whom.

On August 12, 2008, Mr. Devenyns terminated Plaintiff by letter effective August 20, 2008.  Plaintiff's counsel received a bill of particulars regarding the reasons for Plaintiff's termination, which stated the following reasons: 1) insubordination, which referred to disparaging remarks made about Mr. Devenyns and Ms. Roberts and his less than satisfactory response to Mr. Kimball's request for a weekly itinerary; 2) failure to obey lawful orders, for failing to attend an assigned training; 3) unauthorized disclosure/release of confidential information, for sending the Investigation Reports to a County Councilwoman, posting them on a blog, and informing Mr. Kimball about the investigation; 4) unauthorized use of/damage to county property, for damaging Ms. Naugle's desk and not reporting it; and 5) making malicious/irresponsible statements to other officials, for the e-mail sent to Captain Mike Elliott of the Wicomico County Sheriff's Office

On September 26, 2008, the County received a Notice of Charge of Discrimination by Plaintiff alleging retaliation.

Plaintiff appealed his termination to the County Personnel Board who reinstated Plaintiff because they believed that "progressive discipline" might have prevented Plaintiff from committing the violations for which he was terminated.

Plaintiff attempted to return to work on March 5, 2009, and was asked to leave the detention center. Defendants allege that it was because he had not contacted anyone at WCDC about returning to work. After making the appropriate arrangements, Plaintiff returned on March 9, 2009.

On March 9, 2009, Colonel Kimball informed Plaintiff by memorandum that his assignment would be to handle inmate grievances, that his immediate supervisor would be Major Les Moore and that his work hours would be 8:00 a.m. to 4:30 p.m., with 30 minutes for lunch. He was assigned a work station in Major Moore's area. The change in Plaintiff's assignment meant that he was now a non-exempt employee and he did not have an assigned parking space. His salary and benefits remained the same, however. Plaintiff submitted a grievance as to his new position.

On June 25, 2009, Mr. Devenyns changed Plaintiff's position to Community Corrections Officer and had him reporting to a new supervisor, Mike Hammond. Mr. Devenyns alleges that the reason for the change was that WCDC had a greater need for a Community Corrections Officer because of the number of people on electronic home monitoring. Plaintiff again filed another grievance regarding the change to his position.

Defendants claim that Plaintiff could not be restored to his prior position as Internal Affairs Investigator because the position had been abolished.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits, or other documentation which demonstrates that a triable issue of fact exists for trial.  Celotex, 477 U.S. at 324.  Unsupported speculation is insufficient to defeat a motion for summary judgment.  Felty, 818 F.2d at 1128 (citing Ash v. United Parcel

Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986)).

Furthermore, the mere existence of some factual dispute is

insufficient to defeat a motion for summary judgment; there must

be a genuine issue of material fact.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247-48 (1986).  Thus, only disputes over

those facts that might affect the outcome of the case under the

governing law are considered to be "material."  Id.  The non-

moving party is entitled to have "all reasonable inferences . .

. drawn in its respective favor."  Felty v. Graves-Humphreys

Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

**III. DISCUSSION**

**A.    Count I: Title VII – Retaliation**

Section 704(a) of Title VII provides that "[i]t shall be an

unlawful employment practice for an employer to discriminate

against any of his employees ... because [the employee] has

opposed any practice made an unlawful employment practice by

this subchapter."  42 U.S.C.A. § 2000e-3(a).  As Plaintiff has

not provided direct evidence that his suspension and termination

was a result of his retaliation complaint, Plaintiff's Title VII

retaliation claim is evaluated under the burden shifting

framework set out in McDonnell Douglas v. Green, 411 U.S. 792,

802-05.  See Lettieri v. Equant Inc., 478 F.3d 640, 649 (4th

Cir. 2007).  Under the McDonnell Douglas framework, Plaintiff

must first establish a prima facie case of retaliation under

Title VII.  Id. at 646, 650.  Once the prima facie case has been established, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Id. at 648, 651.  If Defendants are able to meet their burden, the burden shifts back to Plaintiff to demonstrate that the reason offered by Defendants is false or pretextual and that the real reason for the action was unlawful retaliation.  Id.

To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate 1) that he engaged in a protected activity; 2) that Defendants took materially adverse action against him; and 3) a causal connection between the protected activity and the adverse employment action.  See Id. at 646, 650.

Protected activities fall into two distinct categories: participation or opposition.  Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C.A. § 2000e-3a (1994)).  "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace."  Id. (citing 42 U.S.C.A. § 2000e-3a (1994)).  Plaintiff attempts to establish that he engaged in both types of activities.

**1. Participation Activity: Plaintiff's EEOC Complaint**

Under the participation category, an employer may not
retaliate against an employee for participating in an ongoing
investigation or proceeding under Title VII. Id. Here,
Plaintiff filed an EEOC charge, which constitutes participation.
Id. Defendants contend, however, that Plaintiff has no proof
that Mr. Devenyns, who recommended Plaintiff's termination, or
Mr. Baker, Mr. Shea, Mr. Thompson, and Ms. Morris, who
ultimately made the decision to terminate Plaintiff, knew
Plaintiff had filed an EEOC charge until September 26, 2008,
almost a month after Plaintiff's termination on August 29, 2008.
For that reason, they argue, the filing of the charge could not
be the cause of his termination. The Court agrees with
Defendants.

The evidence shows only that Plaintiff's direct supervisor,
Mr. Kimball, knew that Plaintiff had filed an EEOC complaint and
no evidence that this information had been passed on to
Defendant Devenyns prior to Plaintiff's termination. The
closest inference that Mr. Devenyns might have known prior to
terminating Plaintiff is the "Told Doug" notation made by County
Attorney Baker next to Kimball's June 9, 2008, note that
Plaintiff had indicated he was going to file a complaint. The
evidence does not show, however, when this notation was made,
who supposedly "told Doug," when the person "told Doug" or what

the person "told Doug." Thus, the Plaintiff cannot establish a prima facie case that his termination was the result of filing a complaint with the EEOC.

Even if Devenyns did not know prior to September 26, 2008, that Plaintiff had filed an EEOC complaint, Plaintiff alleges that the refusal to reinstate Plaintiff to the position of internal affairs investigator or its substantial equivalent following the Personnel Board's decision reversing his termination was a materially adverse action. Plaintiff argues that although his salary and benefits stayed the same, he was stripped of his supervisory powers, reduced to a grade 18 employee from a grade 20 employee, and lost his "exempt" status. Other complaints about the new positions included a change in the work hours and no longer having an assigned parking space.

The Supreme Court has held that actionable retaliation must rise to the level of "material harm." Burlington Northern & Santa Fe Ry Co. v. White, 548 U.S. 53, 68(2006). Material harm means that the retaliatory action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry Co. v. White, 548 U.S. 53, 68 (2006). In Burlington Northern, the Supreme Court found that reassignment to a less desirable job and a period of suspension without pay to be material. Id. at 70-71.

While Defendants argue that Plaintiff's new positions are not adverse actions because the salary and benefits stayed the same and he retained some of his prior job responsibilities, they do not appear to dispute that there was a materially adverse change to his responsibilities. Here Plaintiff provides sufficient evidence to overcome a motion for summary judgment that the change in his assignments following his reinstatement may have constituted an adverse employment action.

Defendants argue that even if the change in job assignment is an adverse employment action, Plaintiff still doesn't establish that the changes in his job were caused by his filing of the EEOC complaint. They claim that they could not reassign Plaintiff to the Internal Affairs Investigator position because the position was abolished following Plaintiff's termination. When Plaintiff returned, they assigned him to the position that was most similar.

Plaintiff's only argument that his reassignment was caused by his filing of the EEOC complaint is to contend that the position was not really abolished. He provides no evidence, however, how the position still exists. For example, he does not show that someone else was hired for the position or that the job duties were simply assigned to someone with a different title. Thus, Plaintiff has not provided any evidence of a

causal connection between the filing of his EEOC complaint and his reassignment.

## 2. Opposition Activity: Publicly Revealing Details of the Investigation

Because Plaintiff has not submitted sufficient evidence to establish a prima facie case of retaliation based on the EEOC charge, he must be able to establish that there is a question as to whether his actions were oppositional.  As noted by the Fourth Circuit, the scope of activity falling under the opposition clause is much narrower than under the participation clause due to the activities under the participation clause being necessary to the machinery set up by Title VII.  Laughlin, 149 F.3d at 259 n. 4.  "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinion in order to bring attention to an employer's discriminatory activities."  Laughlin, 149 F.3d at 259.  The Court must use a balancing test to determine if an employee has engaged in legitimate opposition activity.  Id.  The Court balances "the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel."  Id. (internal quotations omitted).

Although a retaliation claimant does not have to show that the underlying discrimination claim was meritorious to prevail on a retaliation claim, he must show that he had a reasonable belief that his employer violated Title VII. See Peters v. Jenney, 327 F.3d 307, 320-21 (4th Cir. 2003). In order to demonstrate reasonable belief, the plaintiff must demonstrate that he "subjectively (that is, in good faith) believed" that his employer violated Title VII, and that his belief "was objectively reasonable in light of the facts." See Id. (internal citations omitted).

The Parties dispute whether Plaintiff had a reasonable belief that Mr. Devenyns engaged in sexual harassment. Sexual harassment is defined under 29 C.F.R. § 1604.11 as

> [u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose of creating an intimidating, hostile, or offensive working environment.

Plaintiff stated in his deposition that he believed that Mr. Devenyns was engaging in sexual harassment, but he also testified that he understood "sexual harassment" to be "unwanted sexual advances in the workplace." Pl. Dep. 342. He admitted that he did not uncover any evidence of unwanted sexual advances

or harassment because he was not able to complete the investigation. Id. at 342-43. Thus, while Plaintiff may have believed that sexual harassment occurred, the evidence does not demonstrate that his belief was in good faith or "objectively reasonable in light of the facts."

Plaintiff testified that several employees told him that Deputy Director Roberts walked in on Defendant Devenyns having sex with an employee, Jean Murray, who was no longer an employee at the time of Plaintiff's investigation. He alleges that Ms. Roberts confessed this to him by accident, but Ms. Roberts denies making such a statement and denies having seen any inappropriate sexual behavior between Defendant Devenyns and Ms. Murray. In addition, Plaintiff never asked either Ms. Murray or Mr. Devenyns, if the allegation of their sexual relations were true or whether they were consensual. Plaintiff also heard allegations that two other employees had slept with Mr. Devenyns, but when questioned by Plaintiff, they denied the rumors. Plaintiff testifies, however, that Defendant Devenyns admitted to him that he had slept with possibly five women at WCDC; although Mr. Devenyns denies making such a statement. Plaintiff also alleged that Dr. Sharma claimed that Mr. Devenyns confessed to him that he had slept with Ms. Murray and that Dr. Sharma could sleep with her too for $45. Dr. Sharma denies, however, that Mr. Devenyns ever made such a statement to him.

Thus, at best Plaintiff has shown that there were rumors of Mr. Devenyns sleeping with Ms. Murray and possibly other women, but that when put to the test the rumors were found to be false. At best, even if the rumors were true, not one person claimed that the sexual advances were anything but consensual.

Plaintiff argues that the mere fact that Devenyns, as the Director of WCDC, was in a position of power to take advantage of subordinate employees provided him with a good faith and objectively reasonable belief that sexual harassment had occurred. The Court disagrees, however. The mere fact of having power does not demonstrate harassment. Moreover, given that Plaintiff's beliefs of sexual impropriety seemed to be largely shaped by rumor and statements that the speakers themselves deny, the fact that not one of the rumors contained an allegation of harassment is more than enough to find the Plaintiff's belief was not objectively reasonable.

The Court, therefore, finds that Plaintiff has not provided sufficient evidence to establish a reasonable belief that Devenyns was engaging in sexual harassment under the summary judgment standard. Because he has not demonstrated a question that his belief was reasonable, the Court does not reach the question whether his opposition activities were reasonable and therefore protected. As Plaintiff has failed to establish a prima facie case of retaliation sufficient to survive summary

judgment, Defendants' motion will be granted as to Plaintiff's Title VII claim.

## B.   Count II and III: 42 U.S.C. § 1983

### 1.  Count II: First Amendment - Freedom of Speech

Plaintiff claims that his termination based on his disseminating his reports regarding Mr. Devenyns to Councilwoman Prettyman and posting them on a blog violated his First Amendment right to free speech.  A public employee engages in speech protected under the First Amendment if he speaks "as a citizen on a matter of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  This determination is a question of law for the Court to make by examining the content, form, and context of a given statement, "as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 148, 148 n.7 (1983).

The Court undertakes a two step process to decide first if the employee spoke as a "citizen" and second, whether the speech was on a matter of "public concern."  Garcetti, 547 U.S. at 421. If the employee fails to satisfy both of these prongs, he has no First Amendment cause of action based on his employer's reaction to the speech.  Id. at 418.  If, on the other hand, the employee demonstrates that he spoke as a citizen, "that is, outside the scope of employment," on matters of public concern, the First Amendment offers protection if his speech survives the balancing test of Pickering v. Board of Education Of Township High School

District 205, Will County, 391 U.S. 563 (1968).  Id.  Pickering
requires the Court to determine "whether the relevant government
entity had an adequate justification for treating the employee
differently from any other member of the general public."  Id.
(citing Pickering, 391 U.S. at 568).

In Garcetti v. Ceballos, the Supreme Court held that, as a
matter of law, "when public employees make statements pursuant
to their official duties, the employees are not speaking as
citizens for First Amendment purposes, and the Constitution does
not insulate their communications from employer discipline."
Id. at 421.  "Restricting speech that owes its existence to a
public employee's professional responsibilities does not
infringe any liberties the employee might have enjoyed as a
private citizen.  It simply reflects the exercise of employer
control over what the employer itself has commissioned or
created."  Id.  The Court noted that while "exposing
governmental inefficiency and misconduct is a matter of
considerable significance, . . . [a] powerful network of
legislative enactments – such as whistle-blower protection laws
and labor codes [are] available to those who seek to expose
wrongdoing . . . and provide checks on supervisors who would
order unlawful or otherwise inappropriate actions."  Id. at 425-
26.  The Court rejected, however, "the notion that the First

Amendment shields from discipline the expressions employees make pursuant to their professional duties." Id. at 426.

In Garcetti, the plaintiff, a supervising deputy district attorney, reviewed a police affidavit used to obtain a critical search warrant in a case, and determined that it was inaccurate. Id. at 413-14. The plaintiff relayed his findings to his supervisors and recommended dismissal of the case. Id. at 414. The defendants decided to proceed with the prosecution of the case, but the plaintiff testified at a hearing on a defense motion to challenge the warrant, which was rejected by the court. Id. at 414-15. The plaintiff claimed that the defendants subjected him to a series of retaliatory employment actions for exercising his First Amendment right to free speech. Id. at 415. The Court held that because it was undisputed that he had been acting pursuant to his official duties when he relayed the findings to his supervisors and testified at the suppression hearing that he was not speaking as a citizen and his statements were not protected by the First Amendment. Id. at 421-22.

Plaintiff does not dispute that the Reports were prepared pursuant to his official duties. Plaintiff attempts to distinguish his case from Garcetti, however, by arguing that his disseminating of the Reports to the Councilwoman and on the internet was not to his supervisors, as in Garcetti, nor done as

part of his official duties, and in fact was a violation of WCDC policy.  For that reason, he contends that in disseminating the Reports publicly, he was acting as a private citizen.

Garcetti does not provide for such a distinction, however. The Supreme Court is clear that employers have a right to control information that they have commissioned and that the importance of protecting whistleblowing does not simply convert "official" speech made pursuant to one's job duties into "citizen" speech protected by the First Amendment.  Instead, a variety of legislative protections are in place for that purpose.  The question is simply whether the statements were made pursuant to the employee's job duties.  Here, Plaintiff does not dispute that he created the Reports as part of his job duties.  The dissemination of those Reports beyond the borders of his chain of command does not change that fact.

This Court has previously found under similar circumstances that "going public" with what is undeniably speech effected pursuant to employment duties does not convert that speech into "citizen speech".  Andrew v. Clark, 472 F. Supp. 2d 659, 662 (D. Md. 2007) (rev'd on other grounds).  See also Omokehinde v. Detroit Bd. of Educ., 563 F. Supp. 2d 717 (E.D. Mich. 2008).  In Andrew, the plaintiff prepared an internal memorandum addressing the police department's handling of an incident that resulted in the shooting death of an elderly man who had barricaded himself

in his apartment.  Id. at 660.  The plaintiff addressed and
transmitted the memorandum to the Police Commissioner.  Id.
When the Commissioner failed to respond to his memorandum, the
plaintiff provided a copy of the memorandum to a newspaper
reporter who then published an article regarding the shooting.
Id.  The plaintiff alleged that he was fired in retaliation for
providing the memorandum to the media.  Id. 660-61.  The Court
concluded that because the plaintiff had prepared the memorandum
as part of his official duties that it was not protected by the
First Amendment, pursuant to Garcetti.  Id. at 662-63.  The
Court held that leaking the memorandum to the press did not
change that fact.  Id.

> [The memorandum] never lost its character as speech
> pursuant to his official duties simply by virtue of
> the wider dissemination he elected to give it after
> his recommendations were ignored by the police
> commissioner. . . .  The 'internal memorandum' was not
> a mere 'letter to the editor' by a member of the BCPD.
> . . .  While plaintiff attempts to characterize the
> 'internal memorandum' (coupled with his verbal act of
> delivering it to a media source) as speech that falls
> outside the purview of plaintiff's 'official
> responsibilities,' in fact, the very means by which it
> was prepared and the very subject matter it concerned,
> coupled with [the plaintiff's] overt involvement in
> the incident in question," made it clear that the
> plaintiff spoke within "the purview of [his] 'official
> responsibilities.'

Id.

Thus, the Court finds that because Plaintiff prepared the
Reports pursuant to his job duties, he was not speaking as a

"citizen" when he disseminated the Reports outside the WCDC and, as such, his statements were not protected by the First Amendment right to free speech. Defendants' motion will be granted as to Count II.

## C. Count III: 42 U.S.C. § 1983 – First Amendment Freedom to Petition

Here, Plaintiff argues that the alleged retaliation that forms the basis of his Title VII claim also provides the basis for a § 1983 claim that Defendants violated his First Amendment right to petition. In particular, he contends that the retaliation he experienced because of filing an EEOC claim and further grievances for failure to reinstate him to his position as internal affairs investigator is a violation of his constitutional right to petition the government. As discussed in relation to Plaintiff's Title VII claim, however, Plaintiff has failed to demonstrate that he was retaliated against for filing his EEOC claim. Although his Title VII claim did not refer to the grievances filed after the Personnel Board directed that he be reinstated, he has not alleged any evidence of retaliation for filing those grievances. Thus, he has failed to provide sufficient evidence of a violation of his constitutional right to petition. Defendants' motion for summary judgment will be granted as to Count III.

## IV.  Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment will be granted.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: June 3, 2010